AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Western District of Washington

FILED
LODGED
ENTERED
RECEIVED

NOV 14 2014

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY _____ DEPUTY

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
A Rubbermaid plastic storage tub, dark blue in color, )
labeled "games" with blue painter's tape that was given )
to the FBI by S.H. )

Case No. **MJ 14-453**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, attached hereto and incorporated herein by reference

located in the _____ Western _____ District of _____ Washington _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, attached hereto and incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | *Offense Description* |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |

The application is based on these facts:

See Affidavit of Special Agent Andrew Weathers, attached hereto and incorportated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Andrew Weathers, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11-14-14

_____
*Judge's signature*

City and state: Seattle, Washington

Brian A. Tsuchida, United States Magistrate Judge
*Printed name and title*

USAO #2012R01401

# ATTACHMENT A

## ATTACHMENT A
### ITEM TO BE SEARCHED

A Rubbermaid plastic storage tub, dark blue in color, labeled, "games" with blue painter's tape that was given to the FBI by S.H.

# ATTACHMENT B

## ATTACHMENT B
## ITEMS TO BE SEARCHED FOR AND SEIZED

Evidence and/or fruits of the commission of the crime of Wire Fraud in violation of Title 18, United States Code, Section 1343, including, without limitation, the following materials:

1.    All documents concerning Bellwether Wealth Management, including all documents concerning any client of Bellwether Wealth Management;

2.    Currency, precious metals, jewelry, and financial records that show proceeds from wire fraud, and the use and concealment of such proceeds, including United States currency, foreign currency and other monetary instruments, bank records, foreign accounts, safe deposit box records and keys, credit card records, bills, receipts, copies of personal and business tax returns and work papers, vehicle purchase and sale documents and similar items; and other records that show income and expenditures, net worth items including receipts for personal property, precious metals, negotiable instruments, bank drafts, cashier's checks, and similar items.

# AFFIDAVIT OF ANDREW WEATHERS

STATE OF WASHINGTON      )
                              )    ss

COUNTY OF KING           )

I, Andrew Weathers, being first duly sworn on oath, depose and say:

## I.    INTRODUCTION AND AGENT BACKGROUND

1.     I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been so employed since 1998.

2.     I have been a SA for five years and currently assigned to work a variety of criminal matters including but not limited to drug and firearms offenses. I am a graduate of the FBI Academy in Quantico, Virginia, and I have received further specialized training in investigating child pornography and child exploitation crimes. I have investigated drug traffickers, street gangs, drug trafficking organizations, and other criminal organizations. I have participated in the execution of search warrants for firearms violations. I am familiar with street gangs, and drug trafficking organizations in general from my training and experience. Prior to becoming an FBI Special Agent I worked as an Arizona Post Certified Police Officer in Flagstaff, Arizona for five years, where I was assigned to patrol duties and later to the Northern Arizona Metro Narcotics Task Force where I wrote, obtained, and executed numerous search warrants for illegal narcotics, firearms and other contraband. I also investigated credit card fraud or identity theft cases. I received a Bachelor of Science degree in Biology from Northern Arizona University.

3.     This affidavit is based upon my personal knowledge developed during this investigation, information reported to me by witnesses and other law enforcement officers during the course of their official duties, and review of records and other material. Because the purpose of this affidavit is to establish probable cause, not every

AFFIDAVIT OF ANDREW WEATHERS - 1
USAO #2012R01401

1  relevant fact known to me, or to other investigators, is included herein.  Rather, only

2  those facts necessary to establish probable cause will be discussed.

## II.  APPLICABLE LAW

4.      Title 18, United States Code, Section 18 U.S.C. § 1343 provides that it is a

crime for an individual having devised or intending to devise any scheme or artifice to

defraud, or for obtaining money or property by means of false or fraudulent pretenses,

representations, or promises, transmits or causes to be transmitted by means of wire,

radio, or television communication in interstate or foreign commerce, any writings, signs,

signals, pictures, or sounds for the purpose of executing such scheme or artifice.

## III.  STATEMENT OF PROBABLE CAUSE

A.   **Procedural History**

5.      On June 4, 2014, a federal Complaint was signed by United States

Magistrate Judge Dean Brett in the U.S. District Court for the Western District of

Washington alleging that Jeffrey M. Knutsen had committed the crime of Wire Fraud in

violation of Title 18, United States Code, Section 1343.  A copy of the Complaint is

attached as Exhibit 1 and incorporated by reference herein.

6.      In summary, the Complaint charged Jeffrey M. Knutsen with engaging in a

scheme to defraud a number of investors during the period of October 2005 through at

least April 2013 by misappropriating money from their accounts he purportedly managed

as an unregistered investment advisor in the Bellingham area.  The Complaint alleged

that Jeffrey M. Knutsen falsely represented that his management fee would be between

0.85% and 0.90% of assets under management.  Contrary to his representations, he

misappropriated tens of thousands of dollars from his clients' brokerage accounts by

directing money to bank accounts he controlled.

7.      As set forth more fully in the Complaint, Jeffrey M. Knutsen was aware of

the investigation into his activities by at least December 6, 2012 when Bellingham Police

AFFIDAVIT OF ANDREW WEATHERS - 2
USAO #2012R01401

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Detective Tawsha Dykstra interviewed him at the Bellingham Police Department.

2  Complaint, ¶ 30.

3         8.     On August 28, 2014, Jeffrey M. Knutsen pleaded guilty to an Information

4  charging him with one count of Wire Fraud in violation of in violation of Title 18, United

5  States Code, Section 1343 before United State Magistrate Judge Brian A. Tsuchida in the

6  U.S. District Court for the Western District of Washington.

7         9.     In his plea agreement with the United States, Jeffrey M. Knutsen agreed to

8  the following facts:

9            a.     From approximately 2004 through April 2013, Jeffrey M. Knutsen

10  owned and operated Bellwether Financial Services dba Bellwether Wealth Management

11  ("Bellwether") in Bellingham, Washington.

12            b.     From approximately 1996 to July 2005, Jeffrey M. Knutsen was a

13  registered representative with the Financial Industry Regulatory Authority (formerly

   known as the National Association of Securities Dealers)("FINRA").  During the later

14  years of this time period, Jeffrey M. Knutsen was associated with a registered

15  broker/dealer in Bellingham, Washington.

16            c.     In July 2005, FINRA issued an Order barring Jeffrey M. Knutsen

17  from associating with any FINRA member firm in any capacity.

18            d.     After the FINRA Order was entered, Jeffrey M. Knutsen did not

19  inform his clients about the FINRA Order.  Instead, Jeffrey M. Knutsen directed and

   induced certain of his clients to transfer their accounts from the registered broker/dealer

20  to online accounts at E*Trade and TD Ameritrade that Jeffrey M. Knutsen would manage

21  on the clients' behalf.  Jeffrey M. Knutsen was not identified as a registered

   representative on the clients' E*Trade or TD Ameritrade accounts.  Jeffrey M. Knutsen

22  maintained and used the clients' account log-in name and password to access and direct

   activity within the clients' E*Trade or TD Ameritrade accounts.

23            e.     When convincing them to move their accounts from the registered

24  broker/dealer, Jeffrey M. Knutsen falsely told clients that the transfer would reduce their

25  management fees and that he would charge between .85% and 1% of their assets under

   management per year as his management fee.

26

27            f.     Contrary to his representations, in October 2005 and continuing until

   at least April 2013, Jeffrey M. Knutsen misappropriated money from a number of his

28  clients' accounts by issuing electronically generated checks from clients' accounts

AFFIDAVIT OF ANDREW WEATHERS - 3
USAO #2012R01401

payable to himself, in amounts that far exceeded the negotiated management fee, without the clients' knowledge and consent. To perpetuate his fraudulent scheme, Jeffrey M. Knutsen made additional false representations to clients. For example, in late 2012, Jeffrey M. Knutsen induced clients to again transfer their accounts from TD Ameritrade to E*Trade after TD Ameritrade noticed suspicious activity and prohibited Jeffrey M. Knutsen from accessing client accounts.

g.    To execute this fraudulent scheme, Jeffrey M. Knutsen caused E*Trade and TD Ameritrade to issue over 200 checks from his clients' accounts without their knowledge or consent in amounts greater than his represented management fee. Once he issued the electronic checks, Jeffrey M. Knutsen deposited the fraudulently obtained funds into bank accounts in the Western District of Washington that he controlled.

h.    A number of Jeffrey M. Knutsen's victims were elderly, including M.D. and victims S.G. and C.G. Specifically, when the scheme was finally uncovered in early 2013, M.D. was 76 years old, S.G. was 78 years old, and C.G. was 80 years old. Between October 2005 and October 2012, Jeffrey M. Knutsen withdrew nearly $92,000 from the accounts belonging to victims S.G. and C.G.

i.    Specifically, in furtherance of his scheme to defraud, on or about August 20, 2012, Jeffrey M. Knutsen caused T.D. Ameritrade to issue an electronic check in the amount of $1,039 from victim M.D.'s TD Ameritrade account ending in -7917, which Jeffrey M. Knutsen deposited into a Bellwether checking account ending in -1010 at People's Bank in Bellingham, Washington.

j.    When a check is issued into a People's Bank account in Washington State, an electronic message and signal is transmitted from the branch location (all of which are in Washington State) to a data processing center in New Jersey. Additional messages are transmitted and signals are then transmitted back to the responsible branch location, to an electronic check file exchange service in Oklahoma and/or the Federal Reserve Bank in Georgia, as well as to the paying financial institution. TD Bank, which handles transactions of TD Ameritrade, is located in Maine. Thus, the electronic check drawn from MD's account that Jeffrey M. Knutsen deposited into his Washington State People's Bank account involved the use and transmission of interstate wires.

k.    In total, Jeffrey M. Knutsen's fraudulent scheme caused losses to more than 10 clients in an amount between $120,000 and $400,000.

AFFIDAVIT OF ANDREW WEATHERS - 4
USAO #2012R01401

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

**B.     Recently Developed Facts**

10.     On September 4, 2014, just one week after he pleaded guilty, Jeffrey M. Knutsen sent a text message to a former girlfriend with the initials S.H.  According to S.H., she had dated Jeffrey M. Knutsen for a few months, ending the relationship in November 2013.  Jeffey M. Knutsen advised S.H. that his mess was behind him, which S.H. understood to be a reference to Jeffrey M. Knutsen's legal matters related to his arrest.  Jeffrey M. Knutsen also advised S.H. that he thought there was a plastic tin in her garage containing some of his personal belongings he would like returned.  S.H. was unaware any of Jeffrey M. Knutsen's belongings were in her garage, as she had not been in contact with Jeffrey M. Knutsen for many months subsequent to her ending their personal relationship.

11.     According to S.H., Jeffrey M. Knutsen advised her that he had been racking his brain trying to think where he put his paperwork and hard drives, and realized he put them in S.H.'s garage.  Jeffrey M. Knutsen gave S.H. very specific information about where the bin was located and what it looked like.  He described the bin as purple in color, and located in the back corner of her garage under her workbench behind some other items.  According to S.H., she does not know when Jeffrey M. Knutsen placed the bin in her garage.

12.     S.H. said that she had previously discovered that Jeffrey M. Knutsen had accessed her house without her permission and took some tools he left there.  When she asked how he gained access to the house, Jeffrey M. Knutsen told S.H. he had taken an extra key S.H. left out for workers when her house was being remodeled over the summer of 2013.  S.H. was previously unaware he had the key, and demanded that Jeffrey M. Knutsen return it, which he did.

13.     According to S.H., she did not want to have any further dealings with Jeffery M. Knutsen and, therefore, contacted law enforcement authorities to turn over the bin.  S.H. told law enforcement that she did not open the bin prior to turning it over to

1   law enforcement.  S.H. later advised Jeffrey M. Knutsen that she had turned it over to the
2   police, and he responded it contained personal documents and information he needed to
3   prepare taxes.
4           14.     The bin law enforcement obtained from S.H. is a Rubbermaid plastic
5   storage tub, dark blue in color, labeled, "games" with blue painter's tape.  Upon receiving
6   the tub from S.H., FBI Agents Julie Lombardi and Andrew Weathers opened the tub to
7   determine if there was anything dangerous inside, and observed at least two hard drives,
8   and a stack of documents several inches thick, which appeared to include financial
9   statements of Jeffrey M. Knutsen's clients and identified victims.  At that time, Agent
10  Lombardi closed the bin.
11
12                    **IV.**    **CONCLUSION**
13          15.     Based on the aforementioned facts, I believe that probable cause exists to
14  believe that Jeffrey M. Knutsen did knowingly and intentionally commit the offense of
15  wire fraud, in violation of Title 18, United States Code, Section 1343, and that fruits and
16  instrumentalities, as set forth in Attachment B, of that offense will be found in the dark
17  blue plastic storage tub labeled, "games," described in Attachment A, attached hereto
18  and incorporated by reference herein.
19
20                                ANDREW WEATHERS
21                                SPECIAL AGENT
22                                Federal Bureau of Investigation
23  SUBSCRIBED and SWORN to before me this ____14____ day of November, 2014.
24
25
26                                BRIAN A. TSUCHIDA
27                                United States Magistrate Judge
28

AFFIDAVIT OF ANDREW WEATHERS - 6
USAO #2012R01401

FILED ——— ENTERED
LODGED ——— RECEIVED

JUN 0 4 2014

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                               DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

Plaintiff,

v.

JEFFREY M. KNUTSEN,

Defendant.

NO. **MJ 14-228**

**COMPLAINT**

18 U.S.C. § 1343
(Wire Fraud)

BEFORE the Honorable Dean Brett, United States Magistrate Judge, United States Courthouse, Seattle, Washington.

## COUNT 1
### (Wire Fraud)

## I.    INTRODUCTION

1.      From September 6, 2000 through at least April 2013, JEFFREY M. KNUTSEN owned and operated Bellwether Financial Services dba Bellwether Wealth Management ("Bellwether" or "BWM"), an unregistered investment adviser located in Bellingham, Washington.  As the owner and sole proprietor of Bellwether, JEFFREY M. KNUTSEN held himself out as an investment adviser who actively managed client accounts, including the purchase and sale of securities on the clients' behalf.

Complaint/KNUTSEN - 1

1

2.    Prior to creating BWM, JEFFREY M. KNUTSEN was a registered
representative and broker from 1996 through June 2004 associated with Linsco Private
Ledger Corp. ("LPL"), a broker/dealer registered with the Financial Industry Regulatory
Authority ("FINRA") (formerly known as the National Association of Securities
Dealers).  On July 11, 2005, FINRA barred JEFFREY M. KNUTSEN from association
with any FINRA member in any capacity based upon a customer complaint involving the
misappropriation of client funds.

## A.    THE SCHEME AND ARTIFICE TO DEFRAUD

3.    Beginning at a date uncertain, but no later than October 2005, and
continuing until at least April 2013, at Bellingham, within the Western District of
Washington, and elsewhere, the defendant JEFFREY M. KNUTSEN, knowingly devised
a scheme and artifice to defraud investors and to obtain money by means of materially
false and fraudulent pretenses, representations, and promises.

4.    The essence of the scheme and artifice to defraud was that JEFFREY M.
KNUTSEN misappropriated funds from accounts he purportedly managed as an
unregistered investment adviser for clients in the Bellingham area.  During his scheme to
defraud, JEFFREY M. KNUTSEN falsely represented to these clients that he would
charge a small fee to manage their accounts, generally between 0.85% and 0.90% of
assets under management per year.  Contrary to his representations, defendant JEFFREY
M. KNUTSEN misappropriated tens of thousands of dollars of his clients' funds in
excess of his purported management fee without his clients' authorization or consent.
During the course of his scheme, JEFFREY M. KNUTSEN defrauded at least 15
individuals of over $260,000.

5.    It was part of the scheme and artifice to defraud that in late 2004,
JEFFREY M. KNUTSEN induced client MD to invest over $160,000 at BWM for
JEFFREY M. KNUTSEN to manage.  JEFFREY M. KNUTSEN represented to MD that
he would charge 0.90% per year of MD's assets under management to manage MD's
account.  Since JEFFREY M. KNUTSEN was barred from association with any

Complaint/KNUTSEN - 2

registered broker/dealer, he directed MD to open an online account at TD Ameritrade that JEFFREY M. KNUTSEN would manage on MD's behalf, but failed to inform MD that he was barred from association with any registered broker/dealer.

6. It was further part of the scheme and artifice to defraud that in approximately the third quarter of 2008, JEFFREY M. KNUTSEN began misappropriating funds from MD's account. From approximately 2005 through the last quarter of 2007, JEFFREY M. KNUTSEN charged MD the agreed upon 0.90% management fee. During this period, MD paid JEFFREY M. KNUTSEN by writing checks drawn against her Whatcom Educational Credit Union personal checking account. In or about the summer of 2008, JEFFREY M. KNUTSEN convinced MD to permit him to withdraw funds directly from her TD Ameritrade account in lieu of her writing checks from her personal checking account each quarter.

7. From the third quarter of 2008 through October 2012, JEFFREY M. KNUTSEN misappropriated approximately $38,000 in excess of the management fee to which he was entitled pursuant to his agreement with MD by causing electronic checks which did not need a payor's signature to be drawn against MD's TD Ameritrade account. MD did not know about or authorize these excessive payments.

## C. EXECUTION OF THE SCHEME AND ARTIFICE TO DEFRAUD

8. On or about August 20, 2012, at Bellingham, within the Western District of Washington and elsewhere, JEFFREY M. KNUTSEN, for the purpose of executing this scheme and artifice to defraud investors and for obtaining money and property by false and fraudulent pretenses, representations, and promises and attempting to do so, did knowingly transmit and cause to be transmitted writings, signs, signals, and sounds by means of wire, radio, and television communication in interstate commerce, namely an electronic check from MD's TD Ameritrade individual account ending in 7917 to Bellwether's checking account ending in 1010 at People's Bank in Washington State in the amount of $1,039.89.

All in violation of Title 18, United States Code, Section 1343.

Complaint/KNUTSEN - 3

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

2

3  I, Andrew P. Weathers, being first duly sworn on oath, depose and say:

4   1. I am a Special Agent ("SA") with the Federal Bureau of Investigation

5 ("FBI") assigned to the Seattle Division. I have been a Special Agent for five years and

6 currently assigned to work a variety of criminal matters including but not limited to drug

7 and firearms offenses. I am a graduate of the FBI Academy in Quantico, Virginia, and I

8 have received further specialized training in investigating child pornography and child

9 exploitation crimes. I have investigated drug traffickers, street gangs, drug trafficking

10 organizations, and other criminal organizations. I have participated in the execution of

11 search warrants for firearms violations. I am familiar with street gangs, and drug

12 trafficking organizations in general from my training and experience. Prior to becoming

13 an FBI Special Agent I worked as an Arizona Post Certified Police Officer in Flagstaff,

14 Arizona for five years, where I was assigned to patrol duties and later to the Northern

15 Arizona Metro Narcotics Task Force where I wrote, obtained, and executed numerous

16 search warrants for illegal narcotics, firearms and other contraband. I also investigated

17 credit card fraud or identity theft cases. I received a Bachelor of Science degree in

18 Biology from Northern Arizona University.

19   2. This affidavit is based upon my personal knowledge developed during this

20 investigation, information reported to me by witnesses and other law enforcement

21 officers during the course of their official duties, and review of records and other

22 material. Because the purpose of this affidavit is to establish probable cause, not every

23 relevant fact known to me, or to other investigators, is included herein. Rather, only

24 those facts necessary to establish probable cause will be discussed.

25         **SUMMARY OF INVESTIGATION**

26   3. I believe that the investigation leading to the filing of this affidavit has

27 established probable cause to believe that JEFFREY M KNUTSEN has engaged in wire

28 fraud by embezzling large amounts of money from numerous clients, predominantly

elderly individuals, and by concealing his theft through materially false statements and

1

2   omissions.  JEFFREY M. KNUTSEN diverted the money belonging to his customers for

3   his own benefit and provided victim investors with false and misleading information to

4   lull the victims into believing that their money was secure and being properly managed in

5   their best interests.

6   **A.    Background**

7          4.      From in or about late 2004 through at least April 2013, JEFFREY M.

8   KNUTSEN held himself out as a professional financial planner who owned and operated

9   a company, Bellwether Financial Services doing business as Bellwether Wealth

10  Management (collectively, "Bellwether" or "BWM"), based out of Bellingham,

11  Washington.  Based upon this investigation, I believe that, over the course of several

12  years, JEFFREY M. KNUTSEN has embezzled a substantial amount of money from his

13  customers, predominantly elderly individuals, by causing unauthorized fund transfers

14  from customer accounts at online broker/dealers such as TD Ameritrade and E*Trade to

15  BWM bank accounts controlled by JEFFREY M. KNUTSEN.  To date, the investigation

16  has identified over 15 victims with losses of over $260,000.

17         5.      During the time period of the scheme to defraud, JEFFREY M. KNUTSEN

18  and BWM controlled bank accounts at People's Bank, including an account ending in

19  1010, and, later, at Whatcom Educational Credit Union ("WECU"), including a checking

20  account and savings account both ending in 6077.  JEFFREY M. KNUTSEN deposited

21  the funds he misappropriated from client accounts into one of these bank accounts.

22         6.      From in or about 1996 through on or about July 11, 2005, JEFFREY M.

23  KNUTSEN was a registered broker with the Financial Industry Regulatory Authority

24  (formerly known as the National Association of Securities Dealers) ("FINRA"), and

25  during the later years of this time period, was a registered representative for Linsco

26  Private Ledger Corp. ("LPL"), a registered/broker dealer.  In July 2005, FINRA barred

27  JEFFREY M. KNUTSEN from associating with any registered broker/dealer after an

28  elderly customer accused JEFFREY M. KNUTSEN of misappropriating approximately

$90,000 from her account at LPL.

Complaint/KNUTSEN - 5

1

2    7.    JEFFREY M. KNUTSEN did not tell his other clients of the allegations by

3  his client, FINRA's investigation, or FINRA's order barring him from associating with

4  any registered broker/dealer.  Instead, JEFFREY M. KNUTSEN began acting as an

5  unlicensed broker by crafting and executing a scheme to circumvent the FINRA sanction

6  by directing certain of his LPL clients to transfer their accounts from LPL to accounts at

7  online broker/dealers such as E*Trade and TD Ameritrade that he would manage.  As the

8  investigation uncovered, JEFFREY M. KNUTSEN embezzled additional funds from

9  these client accounts, as described below.

10  **B.    The Fraudulent Conduct**

11    8.    About the time the FINRA matter was pending, JEFFREY M. KNUTSEN

12  persuaded certain of his existing clients to move their accounts from LPL, with whom

13  JEFFREY M. KNUTSEN was then registered, to online broker/dealers, namely, TD

14  Ameritrade and E*Trade.  Numerous clients transferred their accounts upon JEFFREY

15  M. KNUTSEN's materially false and misleading information representations concerning

16  the reason to transfer their accounts, and his material omissions concerning the FINRA

17  investigation or sanction.

18    9.    JEFFREY M. KNUTSEN opened the online brokerage accounts on behalf

19  of his clients.  In doing so, JEFFREY M. KNUTSEN, unbeknownst to customers, created

20  alternative email addresses at his "bellwetherwm.com" domain, which he used to register

21  the customer accounts.  While he opened the accounts in his clients' names, JEFFREY

22  M. KNUTSEN maintained the account user names and passwords and retained full

23  access and control over the customer accounts, including check-writing privileges.

24  JEFFREY M. KNUTSEN, however, was not identified as a registered representative on

25  the TD Ameritrade or E*Trade accounts.  In fact, his name appeared nowhere on the

26  clients' account profiles.  Nonetheless, JEFFREY M. KNUTSEN logged onto TD

27  Ameritrade and E*Trade as the account holders (i.e., in their names) purportedly to

28  manage the customer accounts.

Complaint/KNUTSEN - 6

1

2          10.     Using his unfettered access to client accounts, JEFFREY M. KNUTSEN

3  misappropriated hundreds of thousands of dollars from his clients by executing hundreds

4  of unauthorized transfers of client funds to BWM.  The amounts were well in excess of

5  the management fee JEFFREY M. KNUTSEN negotiated with his clients, typically

6  between 0.85% and 1% of the assets under management per year.

7          11.     In late 2012, one of JEFFREY M. KNUTSEN's clients contacted TD

8  Ameritrade concerning the unexpected decline in their account balance.  After a

9  preliminary investigation, TD Ameritrade identified other accounts at TD Ameritrade that

10  appeared to be controlled by JEFFREY M. KNUTSEN.  TD Ameritrade began contacting

11  these clients to inform them that TD Ameritrade intended to ban JEFFREY M.

12  KNUTSEN from accessing their accounts.  Undeterred, JEFFREY M. KNUTSEN then

13  directed certain of these clients to move their investment accounts to E*Trade.  In order

14  to conceal his fraudulent conduct, JEFFREY M. KNUTSEN provided materially false

15  information regarding his recommendation that his clients move their accounts to

16  E*Trade.  For example, in response to an inquiry from a concerned customer about the

17  notice from TD Ameritrade, JEFFREY M. KNUTSEN wrote from his

18  "jeff@bellwetherwm.com" email address:

19          This is only with Ameritrade.  They are trying to force me to join their company
            and pay their fees. . . I am out of town today. . Let her know we will be moving
20          her account to E*Trade and that will solve the problem.

21

22  Through this investigation, I know that JEFFREY M. KNUTSEN's representation

23  regarding TD Ameritrade is false.  Having interviewed numerous witnesses and victims

24  as part of this investigation, I believe JEFFREY KNUTSEN, through such materially

25  false and fraudulent representations, convinced certain clients to transfer their TD

26  Ameritrade accounts to E*Trade in order to continue his scheme and to conceal his theft

27  of funds.

28          12.     As discussed more fully below, JEFFREY M. KNUTSEN continued to
   embezzle client funds even after he was confronted by local law enforcement and after

Complaint/KNUTSEN - 7

1

2  several clients terminated their relationship with JEFFREY M. KNUTSEN based upon

3  their concerns over his handling of their accounts.

4  **B.    Victims CG and SG**

5      13.    In November 2012, an elderly couple, CG and SG, now ages 80 and 77,

6  respectively, walked into the Bellingham Police station to report fraud in relation to their

7  investment accounts.  The accounts were held at TD Ameritrade and purportedly

8  managed by JEFFREY M. KNUTSEN.  The investigation was assigned to Detective

9  Tawsha Dykstra of the Bellingham Police Department.  At the time they approached law

10  enforcement, CG and SG did not know that JEFFREY M. KNUTSEN had been barred

11  from association with any registered broker/dealer as a result of allegations that he stole

12  from another customer's account.

13      14.    Prior to approaching law enforcement, CG and SG discovered that their TD

14  Ameritrade account value was drastically lower than it should have been when they

15  reviewed their investment accounts with the assistance of another financial advisor.  This

16  review of their TD Ameritrade account statements revealed numerous transfers of funds

17  to BWM.  Most of these transfers were done by electronically generated checks, which

18  neither CG nor SG executed or authorized.  From August 2007, when their account

19  balances totaled about $254,100.00, to November 2012, JEFFREY M. KNUTSEN had

20  withdrawn a total of about $76,245.77 from CG and SG's accounts.

21      15.    As a result of their concerns, CG, SG, and the other financial advisor

22  contacted JEFFREY M. KNUTSEN and questioned him about the withdrawals from their

23  account.  JEFFREY M. KNUTSEN told CG and SG that the withdrawals were for

24  management fees.  Documentation obtained through the investigation, however,

25  confirmed that CG and SG's management fee was supposed to be 0.85% of assets under

26  management per year, paid on a quarterly basis.  I am also aware that 0.85% falls within

27  the standard range for asset management fees in the industry.  As set more fully below, an

28  analysis of CG and SG's account revealed that JEFFREY M. KNUTSEN made a number

Complaint/KNUTSEN - 8

1

2  of unauthorized withdrawals from their accounts well in excess of the agreed upon

3  management fee.

4        16.    During the investigation, I learned that CG and SG initially maintained

5  their accounts at LPL under the control of another broker. When that broker retired (in

6  the late 1990s or early 2000s), their LPL accounts were transferred to JEFFREY M.

7  KNUTSEN. According to CG and SG, JEFFREY M. KNUTSEN then moved CG and

8  SG's accounts from LPL to TD Ameritrade. JEFFREY M. KNUTSEN set up the TD

9  Ameritrade accounts in their names but maintained access, ostensibly to manage their

10  investments. For example, account information was sent to "cs[victim last name -

11  redacted]@bellwetherwm.com," an email account set up by JEFFREY M. KNUTSEN at

12  the "bellwetherwm.com" domain, which he controlled and operated. Another e-mail

13  noted on the account documentation from TD Ameritrade is JKnutsen@USWest.net.

14  Notably, since JEFFREY M. KNUTSEN transferred their accounts to TD Ameritrade, he

15  did not conduct any trades or other investments in CG and SG's accounts. In short, the

16  assets simply sat in the account.

17        17.    As part of the ensuing investigation, TD Ameritrade provided law

18  enforcement with copies of several checks issued out of CG and SG's accounts and

19  further confirmed that additional checks had been drawn dating back to October 2005.

20  The vast majority of checks were electronic checks that can be authorized through the

21  online account and do not require a payor's signature.

22        18.    During the investigation, law enforcement obtained and reviewed numerous

23  records, such as account statements, opening documents, and checks, for various

24  investment accounts held at TD Ameritrade and E*Trade, belonging to numerous clients

25  of JEFFREY M. KNUTSEN, including SG and CG. An FBI forensic accountant

26  analyzed these statements and JEFFREY M. KNUTSEN's bank account records from

27  People's Bank and WECU.

28

Complaint/KNUTSEN - 9

19.    The analysis of CG and SG's account revealed that JEFFREY M. KNUTSEN misappropriated nearly $80,000 from their account from October 2005 through October 2012.

20.    In October 2005, the total value of CG and SG's TD Ameritrade accounts was approximately $219,000.  Between the period of October 1, 2005 and December 31, 2012, JEFFREY M. KNUTSEN caused a total of 109 checks totaling $92,337.26 to be drawn from CG and SG's accounts and deposited into the checking account JEFFREY KNUTSEN controlled at People's Bank ending in 1010.  Three checks were handwritten and related to tax preparation fees.  The remaining 106 checks, totaling $91,782.26, were issued electronically from the TD Ameritrade accounts and did not require the payor's signature.  Based upon an 0.85% annual management fee, which is the rate indicated on an invoice provided to law enforcement, the total fee amount for this entire period should have been about $12,509.26.  The chart below provides a summary:

| | | | |
|---|---|---|---|
| 2005[1] | $475.51 | $1,765.43 | ($1,289.92) |
| 2006 | $1,993.09 | $12,249.40 | ($10,256.31) |
| 2007 | $2,150.73 | $5,259.80 | ($3,109.07) |
| 2008 | $1,857.63 | $7,669.60 | ($5,811.97) |
| 2009 | $1,536.07 | $8,071.88 | ($6,535.81) |
| 2010 | $1,672.37 | $21,491.97 | ($19,819.60) |
| 2011 | $1,592.52 | $20,836.84 | ($19,244.32) |
| 2012[2] | $1,231.34 | $14,437.34 | ($13,206.00) |
| **Total** | **$12,509.26** | **$91,782.26** | **($79,273.00)** |

C.    **VICTIM MD**

21.    During its internal investigation, TD Ameritrade also advised that JEFFREY M. KNUTSEN was associated with a number of other account holders,

[1] For period from October through December only
[2] For period from January through October only
Complaint/KNUTSEN - 10

1

2   including MD, an elderly woman in the Bellingham area, who had similar withdrawal

3   activity in her accounts. Other than an initial purchase of stocks in 2004, there had been

4   no trading and investment activity in any of MD's accounts. There were, however,

5   several sales of securities in order to cover numerous cash withdrawals from the account,

6   made on margin.

7          22.     Detective Dykstra thereafter interviewed MD. Among other things, MD

8   recalled that JEFFREY M. KNUTSEN induced MD and her (now-late) spouse to invest

9   about $160,000 at BWM following the retirement of their prior financial advisor. Later,

10  JEFFREY M. KNUTSEN explained to MD that he was moving her accounts to TD

11  Ameritrade, and explained that it was because LPL was charging a high fee. At no time

12  did JEFFREY M. KNUTSEN inform MD that he was barred from association with any

13  registered broker/dealer. According to MD and to the material reviewed by investigators,

14  JEFFREY M. KNUTSEN represented to MD that he would charge 0.90% per year of

15  MD's assets under management to manage MD's account.

16         23.     MD also recalled having a conversation with JEFFREY M. KNUTSEN in

17  approximately January 2008, after her husband passed away, about how MD could no

18  longer afford his fees. JEFFREY M. KNUTSEN told her he was cheaper than anyone

19  else and gave her a form, which she provided to law enforcement. The form stated a

20  direct payment from the investment account could be established to eliminate MD's need

21  to use her personal funds. It stated there was no cost to setup or use this service.

22         24.     MD said that she has not had much interaction with JEFFREY M.

23  KNUTSEN over the past several years. In late 2012, she attempted to contact JEFFREY

24  M. KNUTSEN regarding accessing money in her investment account for expenses, but he

25  did not return her calls or emails. A few months later, after TD Ameritrade had contacted

26  her regarding suspicious activity in her account, MD noticed a sizeable reduction in her

27  account value. At that point, MD realized that a considerable amount of money had been

28  removed from her account.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

2    25.    Detective Dykstra reviewed copies of checks issued from MD's TD

3    Ameritrade accounts. From the period of July 21, 2008 to October 15, 2012, Detective

4    Dykstra counted a total of 74 checks payable to BWM, totaling over $42,000, which

5    substantially exceeded the negotiated management fee. In October 2005, the total value

6    of MD's TD Ameritrade accounts was about $157,000. Between the period of October 1,

7    2005 and October 31, 2012, a total of 84 checks were drawn from MD's accounts and

8    deposited into JEFFREY M. KNUTSEN's bank account at People's Bank, for a total

9    amount of $47,495.28. Nine checks, all before December 2007, were handwritten. The

10   remaining 75 checks were issued electronically from the TD Ameritrade accounts and did

11   not require the payor's signature. Based upon an 0.9% annual management fee, which is

12   the rate MD paid in 2005, 2006, and 2007, when she paid by handwritten check, the total

13   fee amount for this entire period would have been about $9,363.54. Based on the assets

14   under management, the estimated fees would have ranged from between about $1,200 to

15   1,500 per year. From 2008 onward, JEFFREY M. KNUTSEN withdrew significantly

16   more, including over $8,800 in 2010 and approximately $12,400 and $14,350 in 2011

17   and 2012, respectively.

18   26.    In conducting one of the fraudulent transfers, JEFFREY M. KNUTSEN

19   caused an electronic check in the amount of $1,039.89 to be drawn from MD's TD

20   Ameritrade account ending in 7917 and deposited in Bellwether's People's Bank

21   checking account ending in 1010 in Washington State.

22   27.    Based on this investigation, I know that JEFFREY M. KNUTSEN's caused

23   interstate wires and communications to be committed in furtherance of his fraudulent

24   scheme. For example, according to People's Bank, whenever a check is deposited into a

25   People's Bank account, an electronic message and signal is transmitted from the

26   responsible branch location (all of which are in Washington State) to a data processing

27   center located in New Jersey. Additional messages and signals are then transmitted back

28   to the responsible branch location, to an electronic check file exchange service in

Oklahoma and/or the Federal Reserve Bank in Georgia, as well as to the paying financial

Complaint/KNUTSEN - 12

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

2  institution. TD Bank, which handles transactions of TD Ameritrade, is located in Maine.

3  Thus, the electronic check drawn from MD's account that JEFFREY M. KNUTSEN

4  deposited into his Washington State People's Bank account involved the use of interstate

5  wires.

6  **D.    Other Victims**

7        28.    In addition to CG and SG and MD, I have identified more than a dozen

8  other victims of JEFFREY M. KNUTSEN's scheme. Law enforcement has interviewed a

9  number of these victims. For those interviewed, they told law enforcement that

10  JEFFREY M. KNUTSEN agreed to charge them between 0.85% and 1.02% of their

11  assets under management per year. Like for victims CG and SG and MD, the FBI

12  forensic accountant reviewed these victims' brokerage account statements and the bank

13  accounts controlled by JEFFREY M. KNUTSEN to determine if he misappropriated

14  funds from their accounts. That analysis revealed a similar pattern for these victim

15  accounts.

16        29.    Based upon the review of all the victim accounts, including CG and SG and

17  MD, there is probable cause to believe that JEFFREY M. KNUTSEN stole in excess of

18  $260,000 from the approximately 15 to 17 victims.

19  **E.    Interview of JEFFREY M. KNUTSEN**

20        30.    In late 2012, Detective Dykstra contacted JEFFREY M. KNUTSEN by

21  telephone regarding the complaint filed by CG and SG. On December 6, 2012,

22  KNUTSEN voluntarily came to the Bellingham Police Department and met with

23  Detective Dykstra and Detective Ferguson. JEFFREY M. KNUTSEN was informed at

24  the outset that he was there voluntarily and was free to leave at any time. JEFFREY M.

25  KNUTSEN also consented to having the interview video and audio recorded. Among

26  other things, JEFFREY M. KNUTSEN provided the following background information:

27        a.    He is a financial planner, and also provides tax preparation and

28  accounting services. For his business, he uses the names Bellwether Financial,

Bellwether Wealth Management and other similar names.

Complaint/KNUTSEN - 13

1

2          b.     He primarily works out of his home.  He does have an executive

3 office on E Maple Street, in Bellingham, which he used for his mail delivery and

4 answering service.  He can conduct meetings there in one of the executive meeting

5 rooms, if needed.

6          c.     He bought an investment practice, which included about 40 clients,

7 from his former employer in late 1999 or early 2000.

8          d.     He is not licensed to trade for people.  He logs onto TD Ameritrade

9 under the clients' names and manages the accounts.

10         e.     He charges a management fee based upon the percentage of assets

11 under management.  Some clients receive an invoice and pay him by writing a check out

12 of their personal accounts.  Other clients (about five or six, in his estimation) authorized

13 him to automatically withdraw funds from their accounts.

14         f.     When asked about his broker license, JEFFREY M. KNUTSEN first

15 told the detectives that he let his license expire and that, because he does not work on

16 commission, he does not need to be licensed.  When Detective Dykstra later confronted

17 him with the FINRA sanction, JEFFREY M. KNUTSEN changed his story.  He said that

18 the license was suspended due to a misunderstanding and that he could have challenged

19 the suspension and gotten his license back, but did not think it was worth it.  JEFFREY

20 M. KNUTSEN claimed he simply had been borrowing money out of a client's account.

21      31.    When asked about CG and SG, JEFFREY M. KNUTSEN denied any

22 mishandling of their accounts and stated the following, among other things:

23         a.     He managed CG and SG's accounts, which he took over from their

24 prior broker and later moved to TD Ameritrade in about 2004.  He was authorized to

25 withdraw his management fee from their accounts.  He initially sent invoices but that CG

26 told him he no longer had to send them.  He predominantly communicates with them

27 verbally because CG and SG do not have a computer or email.

28         b.     He has no contract with CG or SG stating the management fee.  Nor

did he have a contract authorizing automatic withdrawals.

Complaint/KNUTSEN - 14

1

2        c.        He charges CG and SG a management fee of 3% or so, possibly as

3   high as 3.2% per year (he later would say it was 3.4%), on a monthly basis.  (I know

4   based upon the interviews with CG and SG and review of documentation that the

5   agreement was for KNUTSEN to charge a 0.85% annual management fee.  CG and SG

6   also denied ever discussing a management fee of 3% or more.)

7        d.        About three to four years ago, he realized that he had been

8   undercharging CG and SG and therefore began withdrawing significantly more money to

9   make up the purported difference.  He claimed to have informed CG and SG verbally.  (I

10  know based on the interviews that CG and SG deny ever being told of any alleged

11  underpayment of fees or of additional withdrawals to account for any alleged

12  underpayment.)

13       e.        Some of his withdrawals from CG and SG's accounts were on

14  margin because there was no available cash remaining in the accounts.  KNUTSEN

15  explained that interest is charged on the margin amount and, at some point, an investment

16  would have to be sold to generate cash to pay back the margin deficit.

17       f.        When confronted with an invoice statement that showed the

18  management fee was 0.85% per year, charged quarterly, KNUTSEN said that this

19  document was a mistake.  When pressed by detectives about how what he was saying in

20  the interview did not conform to the documentation, KNUTSEN said, "I made a mistake

21  and that is all I got to say."

22       g.        When asked why his purported management fee seemed extremely

23  high, KNUTSEN then claimed that he did much more for CG and SG than just manage

24  their TD Ameritrade accounts.  When asked to explain, he stated that he also assisted CG

25  and SG with estate planning, outside investments, such as CD rates, and advising their

26  son and a friend on housing purchases.  (I know based on the interviews that CG and SG

27  deny that JEFFREY M. KNUTSEN provided any substantial assistance in these other

28  matters.  Rather, he merely managed their TD Ameritrade accounts and assisted with

filing taxes.)

Complaint/KNUTSEN - 15

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

2    h.    JEFFREY M. KNUTSEN also stated that he does CG and SG's

3  taxes, and charges them a rate of $95 for this service. (Actual payments for tax

4  preparations are $215.00, $220.00 and $120.00 for 2009, 2011 and 2012 respectively.)

5  He confirmed that investment management fees are deductible itemizations for tax

6  purposes. When pressed, he admitted that he did not itemize the amount of money he

7  withdrew from CG and SG's account in 2010 and 2011 (i.e., about $21,000 each year) on

8  their 2010 and 2011 tax return. He stated that, were these amounts management fees, it

9  would have been in CG and SG's financial best interest to itemize them as a deduction.

10    32.    When told that another customer, MD, had also contacted Detective

11  Dykstra about suspected theft, JEFFREY M. KNUTSEN denied any mishandling of her

12  accounts and stated that it was the same type of situation as with CG and SG. Regarding

13  MD, he stated following, among other things:

14    a.    Based on a discussion with MD, he set up an automatic payment of

15  his management fees through withdrawals from her investment accounts.

16    b.    He was charging MD a similar rate to CG and SG. Any additional

17  withdrawals were because he had discovered he had been undercharging MD, just like

18  CG and SG.

19    c.    There was no written contract with MD regarding his fees, nor was

20  there a written contract authorizing automated withdrawals. He claimed to have a voided

21  check from MD and other paperwork showing the fee arrangement.

22    d.    He also did other work for MD that he billed on an hourly basis.

23    33.    The interview ended when JEFFREY M. KNUTSEN said he had another

24  appointment. Detective Dykstra asked JEFFREY M. KNUTSEN for any paperwork he

25  might have for CG and SG, such as any documentation indicating a management fee of

26  3.4% or so and a copy of any voided checks. JEFFREY M. KNUTSEN said he would

27  drop off documents at a later time. To date, JEFFREY M. KNUTSEN has not provided

28  law enforcement with any records or paperwork, nor has he attempted to contact

Detective Dykstra or any other Bellingham police officer to follow up.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

2       34.     Investigators have interviewed CG and SG as well as MD thereafter, and

3    they deny the majority of the representations of JEFFREY M. KNUTSEN regarding their

4    respective accounts.  For instance, among other things, they all denied agreeing to, or

5    ever even discussing, a management fee of 3% or more per year or additional

6    withdrawals for alleged underpayments of fees.

7    **F.    Additional Investigation**

8       35.     As part of the investigation, investigators obtained and reviewed a client list

9    of Bellwether and JEFFREY M. KNUTSEN, which sets forth, among other things, the

10   management fees for each client.  According to the document, the highest fee JEFFREY

11   M. KNUTSEN was authorized to charge any client was 0.90%.  CG and SG were

12   supposed to be charged a 0.85% fee, as was MD.

13      36.     As part of the investigation, investigators interviewed several other

14   witnesses, including a female associate of JEFFREY M. KNUTSEN ("CS").  CS

15   explained that she first met JEFFREY M. KNUTSEN on an online dating site in February

16   2012.  CS and JEFFREY M. KNUTSEN were engaged to be married in November 2012,

17   until CS called off the engagement in May 2013.  CS explained that she was not familiar

18   with all of JEFFREY M. KNUTSEN's business practices, but became aware there were

19   theft allegations in about November 2012 after JEFFREY M. KNUTSEN was contacted

20   by the Bellingham Police Department.  According to CS, at JEFFREY M. KNUTSEN's

21   request, CS assisted JEFFREY M. KNUTSEN with drafting a generic contract that

22   JEFFREY M. KNUTSEN could use for his business.  CS stated that, based on their

23   conversations, she believed that JEFFREY M. KNUTSEN intended to backdate contracts

24   and forge signatures for existing or former clients.

25

26

27

28

Complaint/KNUTSEN - 17

1

2                                    **CONCLUSION**

3          37.      Based on the above facts, I respectfully submit that there is probable cause

4    to believe that JEFFREY M. KNUTSEN did knowingly and intentionally commit the

5    offense of wire fraud, in violation of Title 18, United States Code, Section 1343.

6

7

8                                    Andrew P. Weathers, Complainant
                                     Special Agent, Federal Bureau of Investigation
9

10

11         Based on the Complaint and Affidavit sworn to before me, and subscribed in my

12   presence, the Court hereby finds that there is probable cause to believe the Defendant

13   JEFFREY M. KNUTSEN committed the offense set forth in the Complaint.

14         Dated this _____ day of June, 2014.

15

16

17                                   HON. DEAN BRETT
                                     United States Magistrate Judge
18

19

20

21

22

23

24

25

26

27

28

Complaint/KNUTSEN - 18